**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

MS. LAURA LOOMER
Individually, as a natural person

        Plaintiff,

     v.                                 **COMPLAINT**

New York Media, LLC
d/b/a New York Magazine
75 Varick Street
New York, New York 10013            Civil Action No.  _____

        and

Rolling Stone, LLC, a subsidiary of
Penske Business Media, LLC, d/ba/a "Rolling Stone"
475 5th Avenue
New York, New York 10017

        and

Nathan T. Bernard d/b/a/ Bernard Media
226 Hancock Street
Brooklyn, New York 11236

        and

Media Matters d/b/a/ Media Matters for America
1627 K Street, N.W.
Washington, D.C.

        and

MediaDC, a subsidiary of Clarity Media Group,
d/b/a The Washington Examiner
1152 15th Street, NW, Suite 200
Washington, DC 20005

        and

Verizon Media d/b/a Tech Crunch

770 Broadway 4th Floor
New York, NY, 10003-9558

and

Conde Nast, Inc. d/b/a
GQ or Gentleman's Quarterly Magazine
4 Times Square
New York, NY 10036

and

Happy Mutants LLC, d/b/a BoingBoing.net
775 East Blithedale Avenue, Mill
Valley, California 94941

Defendants.

## COMPLAINT FOR DEFAMATION

Plaintiff, LAURA LOOMER ("Plaintiff" or "Ms. Loomer") hereby files this Complaint against each of the Defendants for Defamation, Defamation Per Se and Defamation by Implication.

## I. JURISDICTION AND VENUE

1. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 under diversity of citizenship.

2. The Plaintiff is a citizen of the State of Florida.

3. None of the Defendants are citizens of the State of Florida.

4. The parties are citizens of different states.

5. The amount in controversy with regard to each of the claims and Defendants exceeds $75,000.

2. Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) as this is the judicial district in which a substantial part of the events or omissions giving rise to the claim occurred and is where

the Plaintiff resides.

## II.   THE PARTIES

      **6.**    Plaintiff Laura Loomer is an individual and a citizen and resident of the state of Florida and lives and does substantial business in this district.

      7.    Defendant <u>New York Magazine</u> is a publication of news, public affairs, analysis and social commentary operated and published by New York Media, LLC, with principal headquarters at 75 Varick Street, New York, New York 10013.

      8.    Defendant <u>Rolling Stone Magazine</u> is a publication of news, public affairs, analysis and social commentary operated and published by Rolling Stone, LLC, a subsidiary of Penske Business Media, LLC, with principal headquarters at 475 5th Avenue, New York, New York 10017.

      9.    Defendant <u>Nathan T. Bernard</u> d/b/a/ Bernard Media is an individual or sole proprietor residing in Brooklyn, New York.

      10.  Nathan T. Bernard is by his own admission a vicious and aggressive social justice warrior on social media, engaging in a systematic and aggressive campaign of knowingly and intentionally defaming conservative leaders with knowingly false information, including seeking to get conservatives banned from the use of social media resources on the internet.  Bernard by his own description conducts his activities with the goals that lying about and silencing political voices he disagrees with are justified, by any means necessary.

      11.  Defendant <u>Media Matters</u> is an internet, on-line publication of news, public affairs,  and analysis of news coverage, particularly attacking conservative messages in the news media, operated and published by Media Matters for America with principal headquarters at 1627 K Street, N.W. Washington, D.C.

12.   Media Matters specializes in systematically and relentlessly lying about and distorting the news of current events in order to falsely deceive journalists and the public by silencing the truth and spreading misinformation about current news with political implications.

13.   Defendant The Washington Examiner is a publication of news, public affairs, analysis and social commentary, operated and published by The Washington Newspaper Publishing Co. LLC d/b/a MediaDC, a subsidiary of Clarity Media Group, with principal headquarters at 1152 15th Street, NW, Suite 200, Washington, DC 20005.

14.   Defendant Tech Crunch is an on-line, internet publication of news, public affairs, analysis and social commentary, which does not clearly publish its corporate structure or ownership, but which is apparently operated and published by Verizon Media with principal headquarters at 770 Broadway 4th Floor, New York, NY, 10003-9558.

15.   Defendant GQ Magazine a/k/a Gentleman's Quarterly Magazine is a publication of news, public affairs, analysis and social commentary operated and published by Conde Nast, Inc., with principal headquarters at 4 Times Square, New York, NY 10036.

16.   Defendant BoingBoing.net is an on-line, internet publication -- actually with a very large following including in this district over many decades -- of news, public affairs, analysis and social commentary, operated and published by Happy Mutants LLC, established under the laws of Delaware, with principal headquarters at 775 East Blithedale Avenue, Mill Valley, California 94941, David Pescovitz managing Member.

## III.  STANDING

17.  Plaintiff Loomer has standing to bring this action because she has been directly affected, victimized and severely damaged by the unlawful conduct complained herein.

18.  Her injuries are proximately caused by the conduct of the Defendants, directly

and indirectly.

19.  Defendants, as alleged herein, published numerous false, misleading and defamatory statements to severely harm and damage Plaintiff Loomer, which were published and republished in this district and widely elsewhere.

20.  Defendants published in this district, nationally and internationally the falsity that Plaintiff Loomer is a White supremacist, neo-Nazi (she is Jewish), an Alt-Righter, a racist, or individual that has engaged in hate and/or violence and is a domestic terrorist, which has a criminal felonious meaning.

21.  Plaintiff was falsely accused of creating a sex tape and was falsely accused of falling for a prank and that she "made up" claims that CAIR lobbied Twitter to ban her.

22.  The false, misleading and defamatory statements were published in this district, domestically and internationally on the internet and elsewhere for the entire world to see and hear.

23.  These false and misleading statements were published with malice, as Defendants knew that they were false and misleading, and/or at a minimum acted and published with a reckless disregard for the truth.

24.  These false and misleading statements subjected Laura Loomer within this district to unjustified ridicule, embarrassment, loss of reputation and professional opportunity and  and prospects.

## IV.  GENERAL ALLEGATIONS OF FACTS

25.  Ms. Loomer is a well-known conservative investigative journalist.

26.  Ms. Loomer is also a conservative Jewish female activist.

27.  In the past, Ms. Loomer has worked for Canadian news publisher, The Rebel

Media, as well as Project Veritas.

28.  Ms. Loomer also has her own media company called Illoominate Media.

29.  Defendants published numerous false, misleading and defamatory statements about Plaintiff Loomer, as set forth in the following paragraphs.

30.  Plaintiff Loomer has been severely harmed and damaged by these false and misleading statements because they subject her to loss of income, hatred, distrust, ridicule, contempt, and disgrace, as well as put her life in danger by those who would seek to retaliate against her.

**31.**  Plaintiff Loomer has been damaged by these false and misleading statements because the statements severely harmed Plaintiff Loomer in her profession and business as an investigative journalist, as well as personally, as pled herein.

32.  Laura Loomer is of course Jewish but Defendants have falsely called her "Alt Right" in an attempt to portray her as a neo-Nazi.

33.  According to the official definition of the Anti-Defamation League -- a once-great institution (but no longer given its having been taken over by the radical  self-hating Jewish left), which once defended Jews like Laura Loomer from public defamation, in their website page "Defining Extremism: A Glossary of White Supremacist Terms, Movements and Philosophies" - -

> **ALT RIGHT**
> The alt right (short for "alternative right") is a segment of the white supremacist movement consisting of a loose network of racists and anti-Semites who reject mainstream conservatism in favor of politics that embrace implicit or explicit racism, anti-Semitism and white supremacy. Many seek to re-inject such bigoted ideas into the conservative movement in the United States. The alt right also includes many racist users of image boards and message forums such as 4chan, 8chan and Reddit who enjoy harassing or "trolling" people who disagree with their views.

6

accessible as of October 30, 2019, at:  https://www.adl.org/education/resources/glossary-terms/defining-extremism-white-supremacy

34.   The term Alt Right is commonly defined as;   "groups which have been identified as alt-right also espouse white supremacism, white separatism, and anti-semitism."

35.   The Anti-Defamation League originally admirably founded to defend Jews further defines "Alt Right":

> **Alt Right: A Primer about the New White Supremacy**
> **Anti-Defamation League**
>
> ADL CEO Jonathan Greenblatt explains what the alt right believes, and why it's so dangerous, on MSNBC.
>
> "People who identify with the Alt Right regard mainstream or traditional conservatives as weak and impotent, largely because they do not sufficiently support racism and anti-Semitism.  Alt Righters frequently disparage the conservative movement by using the derogatory term "cuckservative," popularized in 2015.  The term "cuckservative," a combination of "conservative" and "cuck-old," is used by white supremacists to describe a white Christian conservative who promotes the interests of Jews and non-whites over those of whites.

accessible as of October 30, 2019, at:  https://www.adl.org/resources/backgrounders/alt-right-a-primer-about-the-new-white-supremacy

36.   Plantiff Loomer is a Jewish woman who has dedicated her career to combating anti-Semitism and she has publicly condemned the alt-right, however it is defined.

37.   Plaintiff Loomer has previously requested pursuant to Florida law that these defamatory statements be retracted and an apology made.

38.   The Defendants each and every one of them have knowingly refused to retract their false and defamatory statements about the Plaintiff.

39.   Defamatory statements that the Plaintiff is a neo-Nazi are false.

40.   Establishing that the Defendants' statements against the Plaintiff were made with

actual malice, the Defendants had actual knowledge that the Plaintiff is Jewish and is not a neo-Nazi.

41. Defamatory statements that the Plaintiff is a White Supremacist are false.

42. Defamatory statements that the Plaintiff is a White Nationalist are false.

43. Defamatory statements that the Plaintiff is a racist are false.

44. Establishing that the Defendants' statements that the Plaintiff is a Neo-Nazi, White Supremacist or White Nationalist were made with actual malice, the Defendants had actual knowledge that the Plaintiff is Jewish and is not a neo-Nazi, White Supremacist or a White Nationalist.

45. Establishing that the Defendants' statements that the Plaintiff is a racist were made with actual malice, the Defendants had actual knowledge that the Plaintiff is Jewish and is not a racist.

46. Establishing that the Defendants' statements that the Plaintiff is a Neo-Nazi, White Supremacist or White Nationalist were made with actual malice, the Defendants had actual knowledge that the Plaintiff is and was at all relevant times sincerely motivated by investigating, reporting on, and warning of genuine threats to the national security of the United States and European democracies, motivated in part by the 1993 bombing of the World Trade Center in New York City and the September 11, 2001 terrorist attacks on the United States.

47. Establishing that the Defendants' statements that the Plaintiff is a Neo-Nazi, White Supremacist or White Nationalist were made with actual malice, the Defendants had actual knowledge that the Plaintiff is and was at all relevant times sincerely motivated by fighting the resurgence of anti-semitism in the United States, Europe, and much of the rest of the world.

48. Establishing that the Defendants' statements that the Plaintiff is a Neo-Nazi, White Supremacist or White Nationalist were made with actual malice, the Defendants had actual knowledge that the Plaintiff is and was at all relevant times sincerely motivated by investigating, reporting on, and warning of abuses of women in repressive countries.

49. Defamatory statements that the Plaintiff made a sex tape with Mike Cernovich are false.

50. Establishing that the Defendants' statements against the Plaintiff were made with actual malice, the Defendants had actual knowledge that claims of the Plaintiff making a sex tape were based on reports that "Bernard claims someone passed along word of a potential sex tape featuring Mike Cernovich and fellow anti-Muslim Alt-Righter/ former Project Veritas alum, Laura Loomer" and that Bernard claims some unidentified person anonymously agreed, and that Bernard is conspicuously an activist who is portrayed by the Defendants as being willing to do or say anything to attack a political opponent or advance a partisan agenda.

51. A "grifter" is a person who commits fraud, especially as a con artist.

52. A "troll" in modern slang is a person who does not actually believe what they are saying but who publishes statements merely to cause a reaction from people for amusement or other results.

53. Defamatory statements that the Plaintiff is a grifter are false.

54. Defamatory statements that the Plaintiff does not sincerely believe her public messages and statements, calling her a "grifter" or a "troll," are false.

55. Defamatory statements that the Plaintiff committed fraud are false.

56. Establishing that the Defendants' statements that the Plaintiff is a grifter or troll were made with actual knowledge, that the Plaintiff was at all relevant times sincerely motivated

by reporting truths that are being improperly suppressed by a dishonest news media and biased political culture.

57.   Establishing that the Defendants' statements that the Plaintiff is a grifter or troll were made with actual malice, the Defendants had actual knowledge that the Plaintiff is and was at all relevant times sincerely motivated by investigating, reporting on, and warning of genuine threats to the national security of the United States and European democracies, motivated in part by the 1993 bombing of the World Trade Center in New York City and the 2001 terrorist attacks on the United States.

58.   Establishing that the Defendants' statements that the Plaintiff is a grifter or troll were made with actual malice, the Defendants had actual knowledge that the Plaintiff is and was at all relevant times sincerely motivated by investigating, reporting on, and warning of abuses of women in repressive countries.

59.   Establishing that the Defendants' statements that the Plaintiff is a grifter or troll were made with actual malice, the Defendants had actual knowledge that the Plaintiff is and was at all relevant times sincerely motivated by historical understanding that the United States is vulnerable to the deterioration often suffered by past great nations.

60.   Establishing that the Defendants' statements that the Plaintiff is a grifter or troll were made with actual knowledge, that the Plaintiff was at all relevant times sincerely motivated in allowing the people to know the truth and to decide for themselves rather than having the elites control what the public is allowed to know.

61.   Ms. Loomer is simply a conservative, Jewish woman who has used social media to call out anti-Semitism and violence against homosexuals within the tenets of Islam and Sharia law, while expressing her conservative political views and opinions.

62.  Defendants defamation as pled herein is on-going and compounded each and every day on the internet and elsewhere.

63.  On Friday, May 2, 2019, Ms. Loomer was banned from use of the Facebook social media communication platform.

64.  The Plaintiff's banning by Facebook was caused in part by the defamation and maliciously false reports published by the Defendants.

65.  In a statement released and published widely to the public in this district, nationally and internationally, Facebook explained their purported and false justification behind Ms. Loomer's ban: "We've always banned individuals or organizations that promote or engage in violence and hate, regardless of ideology. The process for evaluating potential violators is extensive and it is what led us to our decision to remove these accounts today."

66.  In issuing the ban against Ms. Loomer, Facebook and its sister publication Instagram publicly designated her as "dangerous," which publication was widely disseminated in this district, nationally and internationally.

67.  Ms. Loomer has never once advocated violence against any person or group of persons, nor engaged in any act of violence.

68.  Ms. Loomer uses social media to call out anti-Semitism, Islamic terrorism, political violence, and violence against homosexuals, as just one example once having tweeted: "Ilhan is pro Sharia Ilhan is pro- FGM [1] Under Sharia homosexuals are oppressed & killed. Women are abused & forced to wear the hijab. Ilhan is anti Jewish."

69.  Ms. Loomer's tweet referred to Rep. Ilhan Omar ("Rep. Omar"), who was elected to Congress from Minnesota and took office in January of 2019.

70.  Rep. Omar's positions and policies are matters of public concern to journalists and

---

[1] Female Genital Mutiliation, a term for extensive circumcision of a girl's or woman's genitals without consent.

voters, influencing the governmental policies and actions of the U.S. Government.

71.  At the heart, those with a difference of opinion about current events and threats to this country and historical trends do not want to publicly debate the facts but instead want to shoot the messenger and smear those bringing forward discussion of news events.

72.  The Defendants and others lobbying them to defame the Plaintiff are trying to transform different interpretations and analyses of current events, threats, and historical patterns into vicious attacks upon Laura Loomer and others who merely lay out the facts for the public.

73.  As a result, the defamation by the Defendants is done with actual malice as a malicious campaign to silence voices with whom they disagree, because they disagree.

74.  The Defendants have knowingly lied about Laura Loomer and others as a knowing and deliberate campaign to censor and silence other points of view.

75.  In some periods in history, Jews like the Plaintiff Laura Loomer and the undersigned counsel were subject to pogroms by those claiming various other religions, and criticism of those anti-Semitic campaigns would have been silence by torture or burning at the stake of those publicly reporting on these threats.

76.  Winston Churchill was ostracized in British politics when he warned of the coming military conflict with the Nazi regime and called upon the free nations to prepare to meet the danger.

77.  Winston Churchill reportedly warned Neville Chamberlain that "You may not be interested in war, but war may be interested in you ...."

78.  In the same manner, the Defendants seek to silence the warnings by Laura Loomer by knowing, intentionally, and with malice aforethought defaming the speakers who share warnings they do not want to hear or allow to be heard.

## V.   GOVERNING LAW OF MALICE

"[M]ost authorities suggest that a failure to retract, in conjunction with other circumstances, may be used to establish the requisite level of [constitutional] malice." John C. Martin, Comment, The Role of Retraction in Defamation Suits, 1993 U. Chi. Legal F. 293, 295 (1993); accord, e.g., *Tavoulareas v. Piro*, 817 F.2d 762, 794, 260 U.S. App. D.C. 39 (D.C. Cir. 1987) (*en banc*) (refusal to retract can be evidence of actual malice); *Golden Bear Distrib. Sys. of Tex., Inc. v. Chase Revel, Inc.*, 708 F.2d 944, 950 (5th Cir 1983), abrogated on other grounds by *Hiller v. Mfrs. Prod. Research Grp. of N. Am., Inc.*, 59 F.3d 1514, 1520-21 (5th Cir. 1995); Restatement (Second) of Torts § 580A, cmt. d (1977) ("Under certain circumstances *evidence [of a refusal to retract a statement after it has been demonstrated to be false] . . . might be relevant in showing recklessness at the time the statement was published.*") (emphasis added).

Whether the statements were published with actual malice is a question for the jury. *Southern Air Transport, Inc. v. Post-Newsweek Stations, Florida, Inc.*, 568 So.2d 927, 929 (Fla. App. 3 Dist. 1990) (extensive citations omitted); *Scholz v. RDV Sports, Inc.*, 710 So.2d 618, 627 (Fla. App. 5 Dist., 1998).  *cf. Miami Herald Pub. Co. v. Ane*, 423 So.2d 376 (Fla. App. 3 Dist., 1982) (actual malice need not be proven when plaintiff is not a public figure).

Actual malice includes publishing defamatory statements with reckless disregard for their truth or falsehood:   "Second, we conclude, contrary to the trial court's finding, that the plaintiff produced sufficient evidence ... that the defendants ... uttered a defamatory falsehood ... with 'actual malice,' i.e., with knowledge that such accusation was false or with reckless disregard of whether it was false or not.  *Southern Air Transport, Inc.*, at 928.

As with Defendant Barnard as a source, one of several factors that court identified was that "the credibility of this informer was greatly suspect." *Id.* at 928.  Another factor was that the

news broadcast emphasized factors supporting the credibility of the informant but withheld information which tended to undermine his credibility. *Id.* at 928-929.

In the Florida case of *Cape Publications, Inc. v. Adams*, 336 So.2d 1197 (Fla. 4th DCA 1976), *cert. denied*, 434 U.S. 943, 98 S.Ct. 440, 54 L.Ed.2d 305 (1977) the Court found that a newspaper exhibited reckless disregard of whether charges were true or false, that is, it published the articles with a high degree of awareness of the probable falsity of the statements. The court found reckless disregard in that the two articles were written "(i)n the face of all those red flags flying." One of the red flags was that a major source had a running feud with the plaintiff.

Here, as in *Cape Publications, Inc.,* the Defendants knew that their stories were highly improbable. Furthermore, actual malice can be shown by a "reckless disregard for the truth" – *see, Reader's Digest Assn. v. Superior Court* 37 Cal.3d 244, 257 (1984) — that the writer ignored warning signs that the statements are false, failed to thoroughly investigate, and failed to conform to journalistic procedures and standards.

Evidence of a lack of an effective editorial process is used as objective evidence that collectively supports a finding of constitutional malice. *See Warford v. Lexington Herald-Leader Co.*, 789 S.W.2d 758 (Ky. 1990), *cert. denied,* 498 U.S. 1047 (1991). In *Warford,* the court delineated numerous items of objective evidence that collectively supported a finding of constitutional malice in the case of a college basketball recruiter defamed by charges of recruiting improprieties. *Warford,* 789 S.W.2d at 772. The defendant reporters made minimal efforts to verify the credibility of their source, a student athlete, despite the plaintiff's denials just prior to publication and the plaintiff's request that the reporter contact several individuals, including the source's parents, friends, and high school coaches. *Id.*

The Defendants also transformed the source's ambiguous statement into "the most

potentially damaging alternative" creating a "jury question on whether the publication was indeed made without serious doubt as to its truthfulness." *Id.* at 772-73 (quoting *Rebozo v. Wash. Post Co.*, 637 F.2d 375, 382 (5th Cir.)).

Actual malice can also be proved by circumstantial evidence. Evidence of negligence, of motive and of intent may be adduced for the purpose of establishing, by cumulation and by appropriate inferences, the fact of a defendant's recklessness or of his knowledge of falsity. *Reader's Digest Assn. v. Superior Court* 37 Cal.3d 244, 257 (1984).

Relying on circumstantial evidence to prove constitutional malice has become the proper method. *See, e.g., Khawar v. Globe Int'l, Inc.*, 965 P.2d 696, 709 (Cal. 1998) ("To prove this culpable mental state, the plaintiff may rely on circumstantial evidence, including evidence of motive and failure to adhere to professional standards."), *cert. denied,* 526 U.S. 1114 (1999).

State and federal courts have undoubtedly recognized that "it would . . . be rare for a defendant . . . to admit to having had serious, unresolved doubts . . . ." *Eastwood v. Nat'l Enquirer, Inc*., 123 F.3d 1249, 1253 (9th Cir. 1997)*(emphasis added)* ("As we have yet to see a defendant who admits to entertaining serious subjective doubt about the authenticity of an article it published, *we must be guided by circumstantial evidence. By examining the editors' actions we try to understand their motives*."); *Liberty Lobby, Inc. v. Anderson*, 746 F.2d 1563, 1569 (D.C. Cir. 1984) ("The plaintiff need not obtain any admission of fault from the defendant."), *vacated on other grounds,* 477 U.S. 242 (1986); *Goldwater,* 414 F.2d at 343.

## VI.  CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### *Common Law Defamation "Per Se"*

79.  Plaintiff re-alleges and incorporates by reference the allegations in the preceding

paragraphs of the Amended Complaint as if fully set forth herein.

80.  The Defendants have defamed the Plaintiff by knowingly, intentionally, willfully, or negligently publishing statements about the Plaintiff, which they knew or should have known to be false.

81.  Defendants knew that their public false statements about the Plaintiff would cause severe damage to the reputation, business opportunities, social relationships, and the career of Plaintiff, and furthermore the Defendants actually intended that result and in many cases made clear in their reports that they intended that result.

82.  Defendants published false and misleading facts, inter alia, that Plaintiff's conduct, characteristics or a condition is incompatible with the proper exercise of her lawful business, trade, profession or office as a journalist, as well as personally.

83.  These false, misleading, and defamatory statements are defamatory per se because these false and misleading statements severely harmed and damaged Plaintiff Loomer in her profession and business as an investigative journalist, as they concern conduct and characteristics incompatible with being an investigative journalist, and personally.

84.  Damage is presumed by law when defamation per se is shown as alleged herein.

85.  An investigative journalist's reputation is paramount.

86.  A statement is per se defamatory if it falsely imputes to another conduct, characteristics, or a condition incompatible with the proper exercise of his lawful business, trade, profession or office; in other words, or if it tended to injure Plaintiff in his trade or profession.

87.  Under Florida Law, "it is established…that an oral communication is actionable per se - that is, without a showing of special damage - if it imputes to another (a) a criminal offense amounting to a felony, or (b) a presently existing venereal or other loathsome and

16

communicable disease, or (c) conduct, characteristics or a condition incompatible with the proper exercise of his lawful business, trade, profession or office, or (d) the other being a woman, acts of unchastity." *Wolfson v. Kirk*, 273 So.2d 774, 777 (Fla. Dist. Ct. App. 1973)

88. A statement is also per se defamatory if "it imputes to another (a) a criminal offense amounting to a felony, or (b) a presently existing venereal or other loathsome and communicable disease, or (c) conduct, characteristics, or a condition incompatible with the proper exercise of his lawful business, trade, profession, or office, or (d) the other being a woman, acts of unchastity." *Campbell v. Jacksonville Kennel Club, Inc*., 66 So. 2d 495, 497 (Fla. 1953) citing Restatement, Torts, Section 570.

89. For Defamation Per Se, actual malice need not be shown because damages are presumed. *Campbell v. Jacksonville Kennel Club, Inc.*, 66 So. 2d 495, 497 (Fla. 1953); *Wolfson v. Kirk*, 273 So. 2d 774 (Fla. Dist. Ct. App. 4th Dist. 1973).

90. Statements are "*defamatory per se,*" recognized under Florida law when statements are so powerful in their ability to hurt someone that Florida law presumes harm as a matter of law. *Montgomery v. Knox,* 23 Fla. 595, 3 So. 211, 217 (1887), such that a judge will allow damages to be awarded in these cases even if no evidence of harm has been presented. "[T]he law presumes malice in their utterance," *Abraham v. Baldwin*, 52 Fla. 151, 42 So. 591, 592 (1906), where the words are "… of such common notoriety established by the general consent of men, that the courts must of necessity take judicial notice of its harmful effect." *Layne v. Tribune Co.*, 108 Fla. 177, 146 So. 234, 236 (1933).

91. The news / news analysis website www.boingboing.net, which is actually surprisingly large for those not familiar with the oddly-named publication, published an article on February 5, 2019, written by Xeni Jardin, titled

17

**"Paypal bans Laura Loomer, noted racist troll grifter**." ² 

92.  Despite its fanciful name, Boing Boing is estimated to receive at least 2.5 million

unique viewers every month and actually ranks at an astonishing Alexa rank of # 5,976 in

"global internet engagement" out of tens of millions of websites on the internet, according to the

Alexa rating service:  https://www.alexa.com/siteinfo/boingboing.net

93.  Defendant Boing Boing further published in that same article:

> A little bit of sunshine on an otherwise gloomy news day:
> troll-for-hire Laura Loomer has been banned by PayPal. She'll
> have to find another way to get paid to show up at political
> events and hassle people loudly.
>
> PayPal is not the first payment service to say they've had
> enough of Laura Loomer's grifter crap.

94.  Defendant Boing Boing stated that Laura Loomer is a racist.

95.  Defendant Boing Boing stated that Laura Loomer is a grifter, which means

someone committing trickery and fraud to get money.

96.  Defendant Boing Boing stated that Laura Loomer is a "troll" which is modern

slang for a person who publicizes things that they do not believe to get a reaction.

97.  Defendant Boing Boing stated that Laura Loomer 's work is "crap."

98.  On November 15, 2017, New York Magazine published a story titled "Twitter Is

Mass Un-Verifying Alt-Right and White Supremacist Accounts" reporting the Plaintiff to be a

White supremacist.  http://nymag.com/intelligencer/2017/11/twitter-un-verifying-alt-right-

accounts-like-richard-spencer.html

99.  Defendant depicted this as meaning that Laura Loomer is a neo-Nazi.

100. New York Magazine reported this in the context of Jason Kessler who is

portrayed as a neo-Nazi who led an allegedly White supremacist rally in Charlottesville,

---

²      accessible at:  https://boingboing.net/2019/02/05/paypal-bans-laura-loomer.html

Virginia.



101. Defendant actually knew that Laura Loomer is not a White supremacist.

102. Defendant published its report that Laura Loomer is a White supremacist with reckless indifference to the truth or falsehood of the report.

103. Defendant actually knew that Laura Loomer is not a neo-Nazi.

104. Defendant actually knew that Laura Loomer is not alt-Right.

105. Defendant published its report that Laura Loomer is a neo-Nazi with reckless indifference to the truth or falsehood of the report by using Loomer's picture as the graphic image for the story about the unverified "white supremacists".

106. Accusing a person of being a White supremacist is defamation *per se* and is an accusation of a loathsome social status for the person so defamed.

107. Accusing a person of being a neo-Nazi and using a person's picture in a story

about neo-Nazi's and White supremacists is defamation *per se* and is an accusation of a

loathsome social status for the person so defamed.

108. On July 24, 2018, The Rolling Stone republished a report from Defendant Nathan

Bernard d/b/a Bernard Media that Laura Loomer had filmed a sex tape with fellow Conservative

journalist Mike Cernovich.

> The project didn't ease into the fray, either. In January, Bernard claims
> someone passed along word of a potential sex tape featuring Mike
> Cernovich and fellow anti-Muslim Alt-Righter/ former Project Veritas
> alum, Laura Loomer. Soon after, Bernard says, an off-the-record source
> from within the Alt-Right social circle backed up the assertion. Unlike
> his past stories and Twitter trolling, Bernard is adamant this rumor came
> from a very real person. To Bernard it encapsulated "who they are so
> nicely," giving him the opportunity to break an embarrassing story
> instead of repurposing his targets' self-embarrassments. But asserting the
> existence of a private tape between two people, one of whom is married
> with a young child, carried with it far more serious consequences than
> reminding us that Cernovich once flubbed an appearance on Alex Jones'
> show, or that time Baked live-streamed for hours from an In-and-Out
> parking lot after Twitter booted him.

https://www.rollingstone.com/culture/culture-features/nathan-bernard-meet-the-man-trolling-the-alt-right-on-twitter-702455/

20



*Read Next*   **Missy Elliott's 'Iconology' Reminds Us Why She's One of the All-Time Greats**

☰ Menu

For Bernard's first "investigation," – "**Gorillas Gone Wild: The Mike Cernovich Sex Tape?**" – he took on the role of amateur journalist, reaching out to both Cernovich and Loomer for comment. Cernovich's lawyer responded for him, first denying the tape's existence before oddly closing with, "In the event that you are in possession of (or come into the possession of) a sex tape starring Mr. Cernovich, I presume that it would be somewhat old material."

ADVERTISEMENT

Loomer also responded to Bernard, saying he was knowingly peddling fake news.

"She just threatened me like crazy. She [accused me of] sexual harassment, soliciting revenge porn, all this nutso stuff," he says.

"There's a lot of ways to investigate and expose and take down these people. And BM just kind of does that in creative ways, but it still messes with them," Bernard says. "You know, either satirize these people in some way or expose these people with real truths that again have actual consequences."

The project didn't ease into the fray, either. In January, Bernard claims someone passed along word of a potential sex tape featuring Mike Cernovich and fellow anti-Muslim Alt-Righter/ former Project Veritas alum, **Laura Loomer**. Soon after, Bernard says, an off-the-record source from within the Alt-Right social circle backed up the assertion. Unlike his past stories and Twitter trolling, Bernard is adamant this rumor came from a very real person. To Bernard it encapsulated "who they are so nicely," giving him the opportunity to break an embarrassing story instead of repurposing his targets' self-embarrassments. But asserting the existence of a private tape between two people, one of whom is married with a young child, carried with it far more serious consequences than reminding us that Cernovich once **flubbed an appearance** on Alex Jones' show, or that time Baked live-streamed for hours from an **In-and-Out parking lot** after Twitter booted him. Not that it took long for him to make up his mind.

"I mean, I don't feel any heartbreak, or any moral qualms..." he says, before quickly adding, "There was probably a moment before I published [the sex tape article] where I was, like, 'Oh, God. Shit. Am I actually going to do this? Am I actually going to – I mean, what's the goal? Is this going to mess up his marriage? Is this going to mess up his life?"

He pauses before answering with a sudden finality.

"Yeah, for sure. I mean, he's a bad person...I don't care if that happens him, frankly. I don't care at all."

109. There was no news value or public interest in re-publishing Nathan Bernard's smears of Plaintiff Laura Loomer except as a ploy to directly defame Laura Loomer through the voice of Nathan Bernard.

110. Because Mike Cernovich is married, the Rolling Stone accused the Plaintiff Laura Loomer of adultery as a means to "slut shame" Loomer and brand her a home wrecking whore.

111. Defendant published its report that Laura Loomer recorded a sex tape in an adulterous affair with reckless indifference to the truth or falsehood of the report.

112. Accusing a person of filming a sex tape is defamation *per se* and is an accusation of a loathsome social status for the person so defamed.

113. Accusing a person of being a-an Alt-Righter meaning a neo-Nazi is defamation

*per se* and is an accusation of a loathsome social status for the person so defamed.

114. Defendant admitted that it had actual knowledge that the accusation was denied by the Plaintiff and by Mike Cernovich, when the Defendant included the reports:

> Loomer also responded to Bernard, saying he was knowingly peddling fake news.
>
> "She just threatened me like crazy. She [accused me of] sexual harassment, soliciting revenge porn, all this nutso stuff," he says.

115. Nevertheless, the Rolling Stone published the accusation as if true.

116. The Rolling Stone published its malicious intent as actual malice:

> "I want to expose them. I want to totally take them down. I want them done with," he explains. As for collateral damage from all the trolling, including stories based on allegedly legitimate tipoffs like the sex tape, "I think that [Cernovich's] wife and the kid should just get out, man. I don't think that's a healthy environment for someone to be trotting their kid around on **Periscope** and talking about pedophilia and all this nutso stuff."

117. Defendant <u>Rolling Stone</u> knowingly and intentionally re-published defamation of the Plaintiff under the guise of reporting on -- for some unknown reason -- the attacks on conservatives by Nathan Bernard.

118. Neither Barnard nor his campaigns of defamation are newsworthy other than as a gimmick to re-publish defamatory false accusations against the Plaintiff and other leading conservatives.

119. Other than as a vehicle for spreading the defamatory claims against Laura Loomer and Mike Cernovich, the article about Nathan Bernard would have no purpose.

120. On July 24, 2018, <u>The Rolling Stone</u> published a report that Laura Loomer is an Alt-Righter, meaning that Laura Loomer is a neo-Nazi.

121. Accusing a person of being a neo-Nazi is defamation *per se* and is an accusation

of a loathsome social status for the person so defamed.

122. Defendant actually knew that Laura Loomer is not an Alt-Righter.

123. Defendant actually knew that Laura Loomer is not a neo-Nazi.

124. Defendant published its report that Laura Loomer is a neo-Nazi with reckless indifference to the truth or falsehood of the report.

125. Defendant GQ Magazine published an article by Luke Darby on January 16, 2019, titled "How The Wall Street sJournal Got Roped into a Prank on a Right-Wing Wannabe Media Star:  A prank on the anti-Muslim zealot Laura Loomer somehow made it into The Wall Street Journal as an actual story."

126. GQ Magazine accused Laura Loomer of being a "grifter" --

"The past few years have seen a surge of very online grifters among both liberals and conservatives. In fact, there's an entire roster of self-styled activists and reporters who are eagerly trying to make a name for themselves by going all in with the alt-right. This includes rubes like Jacob Wohl and Laura Loomer."

https://www.gq.com/story/wall-street-journal-right-wing-prank

127. A grifter is a person who commits fraud, especially as a con artist.

128. Accusing a person of committing fraud is defamation *per se* and is an accusation of a loathsome social status for the person so defamed.

129. Defendant published its report that Laura Loomer is a neo-Nazi with reckless indifference to the truth or falsehood of the report.

130. GQ Magazine also lied about Laura Loomer. In their article, GQ claimed that the reports of why Loomer was inappropriately banned from Twitter, the claim that the Council on Islamic-American Relations (CAIR) lobbied Twitter to ban Laura Loomer from Twitter, was a claim given to *The Wall Street Journal* from Laura Loomer herself.

131. However the Wall Street Journal article literally quoted Zahra Billoo, a pro-Jihad, anti-Jewish CAIR employee in its article admitting that CAIR lobbied Twitter to ban Laura Loomer, who is Jewish. Loomer never contacted *The Wall Street Journal* with the claim. The Wall Street Journal had an admission from a CAIR executive who admitted the designated Islamic terrorist organization lobbied Twitter to ban Loomer.

https://www.wsj.com/articles/facebook-twitter-solicit-outside-groups-often-on-the-right-to-referee-political-speech-11546966779

132. GQ Magazine further published that:  "While Bernard and Gillen may have succeeded in exposing Loomer as an extremely gullible loon, it's extremely unfortunate they had to loop CAIR into the mix. It fed into Loomer's obsession with Muslims, yes. But CAIR is already pretty maligned by the right, and the fringe circles Loomer moves in certainly don't need even more reasons to antagonize Muslims."

133. Stating that Laura Loomer is a "gullible loon" falsely imputes to the Plaintiff conduct, characteristics, or a condition incompatible with the proper exercise of her lawful business, trade, profession or office; in other words, or if it tended to injure Plaintiff in his trade or profession.

134. The accusation that Loomer is "gullible" is not a subjective analysis or opinion, but is a specific factual statement that Loomer is unable to carry out the duties of her profession due to a defect in her ability to analyze and comprehend important issues and exercise sound judgment because of being "gullible."  That is not opinion but an accusation of a mental defect as a professional.

135. Similarly, the accusation that Loomer is a "loon" while expressed in colorful language is also a factual, non-subjective accusation that Loomer is mentally irrational and unable to carry out the duties of her profession due to a defect in her ability to comprehend

important issues and exercise sound judgment because of being a "loon"  -- that is, irrational.

136. Defendant published its report that Laura Loomer is a neo-Nazi with reckless indifference to the truth or falsehood of the report.

137. In April, Plaintiff Loomer filed a lawsuit against CAIR and Twitter for tortious interference.

https://www.jpost.com/Diaspora/Conservative-Jewish-American-journalist-is-suing-CAIR-and-Twitter-587337

138. On April 8, 2019, Defendant Media Matters published an article titled  "The White Nationalist Influencers of Instagram" in which Media Matters defamed the Plaintiff Laura Loomer as being a "White Nationalist" or racist.   https://www.mediamatters.org/white-nationalism/white-nationalist-influencers-instagram

139. Media Matters defamed the Plaintiff by publishing defamatory statements about the Plaintiff in the following context and set-up to those statements:

> Like Facebook, Instagram (which is owned by Facebook) has failed to remove major white nationalist accounts. Media Matters reviewed 19 Instagram handles affiliated with white nationalist media outlets and figures and extremist social media figures and found that only a few were regularly posting images, captions, and stories which explicitly praised white nationalist anti-immigrant, anti-semitic, and anti-Muslim stances.

140.      Media Matters further defamed the Plaintiff publishing:

> **There are widely followed Instagram handles directly posting white nationalist content:**
>
> Laura Loomer (@loomered), who was banned from Twitter for making anti-Muslim attacks against Rep. Ilhan Omar (D-MN), has turned to Instagram to push the same bigoted misinformation. In one post, Loomer called Omar a "hate crime hoax expert" and claimed that she had faked bomb threats made against her. In other posts, Loomer has falsely labeled Omar as "pro sharia law"; claimed that *Vogue* supported "terrorism and Jew hatred" because the magazine

put Omar on a cover; and wrote that Omar's "lifestyle is bankrolled by Arabs who only have a loyalty to Islam."

Loomer's anti-Muslim, white nationalist Instagram content extends beyond bigoted attacks on Omar. One day after the mosque shootings in Christchurch, New Zealand, where 49 people were killed by a white supremacist, Loomer published three posts downplaying the anti-Muslim terrorist attack. In the first post, while also referencing smears against Omar, Loomer stated: "The media makes so many excuses for anti-Semitism but then they want us to care about certain groups of people more than others." In the second, Loomer came after the media again for covering the Christchurch terror attack while allegedly ignoring Christians "murdered by jihadists." And in the third post, Loomer wrote: "How come the New Zealand mosque shooting video is available online, but pictures from inside Bataclan theatre in paris are not … ? ... Never forget these innocent people in Paris who were so selfishly murdered simply because they were Westerners." Loomer has over 111,000 followers.

141. Media Matters attacked Laura Loomer as a "white nationalist", yet Loomer is Jewish.

142. Defendant published its report that Laura Loomer is a neo-Nazi with reckless indifference to the truth or falsehood of the report.

143. Less than one month later on May 2, 2019, Plaintiff Loomer was banned from Instagram and further defamed as a "dangerous individual".

144. Plaintiff Loomer has since filed a defamation lawsuit against Facebook, which owns Instagram.   See, e.g. Brittany Shammas,  Miami New Times, July 10, 2019, ,

https://www.miaminewtimes.com/news/laura-loomer-files-3-billion-defamation-lawsuit-against-facebook-11215206

145. On August 6, 2019, the Defendant The Washington Examiner published an article by their employee Tiana Lowe, titled "Laura Loomer may be a laughing stock, but it's pretty unfunny when Republicans back her"

"You know, that Laura Loomer, the anti-Muslim activist and who has

been banned not only by big global businesses including PayPal and
Uber but also by CPAC for publicly harassing journalists and Muslim
Lyft drivers, and using tech services to assist Islamophobic hate
organizations. <u>She's the one challenging a Democratic incumbent in a
district where she's never actually lived."</u>

<u>https://www.washingtonexaminer.com/opinion/laura-loomer-may-be-a-laughing-stock-but-its-
pretty-unfunny-when-republicans-back-her</u>

146. Defendant published the false allegation that while running for political office

Laura Loomer did not live in the district in which she was running for political office:  "She's the

one challenging a Democratic incumbent in a district where she's never actually lived."

147. Thus, the Defendant publicly accused Laura Loomer of being engaged in criminal

election fraud, at least as how the report would have been understood by the reader.

148. Defendant published its report that Laura Loomer did not live in the district where

she was running for office with reckless indifference to the truth or falsehood of the report.

149. The Defendant's accusation is in fact false.

150. The Defendant further defamed the Plaintiff by publishing that she is outside of

respectable society and not a person to be taken seriously in politics:

As hilarious as Loomer's inevitable public implosion may be, it's still an
ominous one so long as Republicans wishing to consider themselves
members of respectable society entertain her candidacy seriously.

151. The Defendant further defamed the Plaintiff by publishing that she is a White

supremacist and a terrorist:

Surely some of her desperate campaign tactics will be mockable and
entertaining (she chained herself to Twitter headquarters after they
banned her), but there are also reasons to find her run unfunny.

As this weekend's shooting in El Paso reminded the nation, white
supremacist terrorism is on a terrifying uptick, and histrionic loony tunes
like Loomer have suicide bombed their reputations, permanently, to
enable them.

152. The Defendant clearly described Plaintiff as a terrorist:  "Loomer's radicalization began just as so many Jihadist terrorists did, in childhood after 9/11 and with an increasingly complete belief that the other — in Loomer's case, Islam in all forms — is incompatible with her way of life."

153. The Defendant published this false statement with reckless indifference to its truth or falsity, specifically by not actually listening to or reading what Laura Loomer says.  Rather than just paying attention to what Loomer has actually said and done, the Defendant recklessly describes her as a terrorist.

154. Ms. Loomer has never once advocated violence against any person or group of persons, nor engaged in any act of violence.

155. Although a tortured sentence in its structure, the Washington Examiner clearly identified Laura Loomer as enabling white supremacist terrorists:  "As this weekend's shooting in El Paso reminded the nation, white supremacist terrorism is on a terrifying uptick, and histrionic loony tunes like Loomer have suicide bombed their reputations, permanently, to enable them *[that is, white supremacist terrorism]*."

156. On November 15, 2017, Defendant Tech Crunch published an article titled "Twitter removes verified checkmarks from several white supremacists' profiles" in which the Defendant defamed the Plaintiff Laura Loomer as being a "White supremacist" or racist. https://techcrunch.com/2017/11/15/twitter-removes-verified-checkmarks-from-several-white-supremacists-profiles/

157. In the context of the title of the article:   "Twitter removes verified checkmarks from several white supremacists' profiles" the Defendant identified Laura Loomer as one of those White supremacists:

Other users who lost verified status include Laura Loomer and Tommy
Robinson. Loomer was banned from Uber and Lyft earlier this month
after tweeting a rant calling for a "non Islamic form of Uber or Lyft."
Loomer also claimed that Twitter is making her account harder to find
and said the platform is "trying to eradicate my presence. Just like Hitler."
Twitter just emailed me to tell me they are removing my "verified badge"
because they claim my account "doesn't comply with Twitter's guidelines
for verified accounts."

Translation: I'm a conservative. pic.twitter.com/F1AsxWI6Fm
— Laura Loomer (@LauraLoomer) November 15, 2017
And so it begins. Twitter is quick to call me and others Nazis, but they are
literally trying to eradicate my presence. Just like
Hitler. https://t.co/qaVWOMKyc0
— Laura Loomer (@LauraLoomer) November 16, 2017

158. Laura Loomer is of course Jewish but is being called a Nazi by Techcrunch, a

popular technology magazine.

159. Defendant published its report that Laura Loomer is a White supremacist with

reckless indifference to the truth or falsehood of the report.

## SECOND CAUSE OF ACTION
### *Common Law General Defamation*

160.    Plaintiff repeats and re-alleges each and every allegation of the foregoing

paragraphs as if fully set forth herein.

161.    The Defendants – all of the Defendants -- together and each of them individually

have defamed the Plaintiff by knowingly, intentionally, and willfully publishing statements about

the Plaintiff which they knew or should have known to be false.

162.    To establish general defamation, a plaintiff must show: (1) publication; (2) falsity;

(3) that the defendant acted with knowledge or reckless disregard as to the falsity on a matter

concerning a public figure; (4) actual damages; and (5) the statement must be defamatory.

163.    Pleading in the alternative to the First Cause of Action, Plaintiff re-alleges each of the statements alleged under the First Cause of Action, *supra*, as defamation *per se*, and here alleges that each of those statements are also explicit defamation under Florida law

164.    For each of the published false statements made by the Defendants chronicled in detail above under the First Cause of Action, which are incorporated by reference herein, the Plaintiff alleges that each and every one of those false statements about her -- each considered one by one -- are defamation of her under Florida's common law of general defamation.

165.    For each of the published false statements made by the Defendants chronicled in detail above under the First Cause of Action, the Plaintiff has been harmed in her profession and reputation and alleges her damages and respectfully demands judgment against each of the Defendants for each of the false, defamatory statements.

**THIRD CAUSE OF ACTION**

*Common Law Defamation By Implication*

166.    Plaintiff repeats and re-alleges each and every allegation of the foregoing paragraphs as if fully set forth herein.

167.    The Defendants – all of the Defendants – together and each of them individually, have defamed Plaintiff by knowingly, intentionally, willfully, or negligently publishing statements about the Plaintiff which they knew or should have known to be false or misleading.

168.    For Defamation by Implication: " . . . [L]iterally true statements can be defamatory where they create a false impression. This variation is known as Defamation by Implication and has a longstanding history in defamation law." *See Jews for Jesus, Inc. v. Rapp*, 997 So.2d 1098, 1106 (Fla. 2008). Defamation by Implication occurs when a publication states

facts that are literally true, but produces a defamatory meaning apparent from a plain reading of the publication in its entirety. See *Chapin v. Knight-Ridder, Inc.* 993 F.3d 1087 (4th Cir. 1993).

169.     Pleading in the alternative, Plaintiff re-alleges that each of the statements alleged under the First Cause of Action, *supra*, are in the alternative also Defamation by Implication under Florida law.

170.     For each of the published false statements made by the Defendants chronicled in detail above under the First Cause of Action, which are incorporated by reference herein, the Plaintiff alleges that each and every one of those false statements about her -- each considered one by one -- are defamation by implication of her under Florida's common law.

171.     For each of the false implications created by the Defendants in each of their publications chronicled in detail above under the First Cause of Action, the Plaintiff has been harmed in her profession and reputation, especially now that Plaintiff Laura Loomer is a declared Republican candidate for US Congress in Florida's 21st Congressional District, and alleges her damages and respectfully demands judgment against each of the Defendants for each of the false, defamatory statements including the implications and implied defamation presented.

### **PRAYER FOR RELIEF**

With regard to all counts, Plaintiff demands that judgment be entered against Defendants, each and every one of them**.**

Plaintiff Laura Loomer prays for judgment against Defendants as follows:

a. Awarding Plaintiff Loomer compensatory, including actual, consequential, and incidental damages for malicious defamatory conduct as alleged herein in an amount to be determined at trial and  in excess of  90 Million U.S. Dollars.

b. Awarding punitive damages for Defendants malicious defamatory conduct based on

the routine and accepted calculation of 5 percent of each of the Defendants' current net worth, designed to sufficiently punish Defendants in order that its illegal conduct not reoccur.

      c. Awarding Plaintiff Loomer attorney's fees and costs.

      d. Granting any such further relief as the Court deems appropriate including preliminary and permanent injunctive relief

## JURY DEMAND

**Plaintiff Laura Loomer respectfully demands a jury trial on all issues so triable.**


Dated: November 14, 2019                     Respectfully submitted,

                                       */s/ Larry Klayman*
                                       Larry Klayman, Esq.
                                       Klayman Law Firm
                                       7050 W Palmetto Park Rd.
                                       Suite 15-287
                                       Boca Raton, Florida 33433
                                       Telephone:  (561) 558-5536
                                       Email:  leklayman@gmail.com
                                       Attorney for Plaintiff